IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

KYLE LEE MONAHAN,

                Plaintiff,                                OPINION AND ORDER

    v.                                            19-cv-414-wmc

WAYNE OLSON,

                Defendant.

_____

     Kyle Monahan, a former state prisoner who is currently on community supervision, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, challenging his state court conviction for one count of homicide by intoxicated use of a motor vehicle. More specifically, petitioner Monahan claims that the state trial court violated his Sixth Amendment right to present a defense in excluding car GPS evidence leading up to the fatal crash. For the following reasons, the court concludes that the exclusion of this GPS data did not have a substantial and injurious effect on the verdict. Accordingly, the petition must be denied.

BACKGROUND[1]

**A. The Accident**

    In August 2011, Monahan and his girlfriend, R.C., attended a party at a farm, where both drank alcohol before leaving together in R.C.'s car. R.C.'s car then crashed, rolled over and ejected them, injuring Monahan and killing R.C.

_____

[1] The court takes the following facts from the trial transcript and the Wisconsin Supreme Court's decision affirming Monahan's conviction. *State v. Monahan*, 2018 WI 80, 383 Wis. 2d 100, 913 N.W.2d 894.

GPS data showed that the car traveled fast, reaching speeds over 90 miles per hour on its way to the farm when R.C. was apparently driving.  (Ex. 20 (dkt. #9-2) 13-14.)  The same data showed the car traveled even faster, sometimes over 100 miles per hour, between the farm and downtown Shullsburg, Wisconsin.  *Monahan*, 2018 WI 80, ¶ 18.  The car stopped for about two minutes in downtown Shullsburg, then resumed the trip at similarly high speeds until it crashed at around 8:00 pm.  *Id.*; (ex. 14 (dkt. #5-14) 51.)[2]  Ultimately, Monahan was charged with and convicted of homicide by intoxicated use of a motor vehicle.

## B.  Trial Proceedings

At trial, Monahan moved for admission of the GPS data for the entire trip, arguing that the data showed that R.C. was likely driving before and after the Shullsburg stop, as the driving speed was similar on both legs of the trip.  *Monahan*, 2018 WI 80, ¶ 19.  In particular, he argued that this GPS data, when combined with eyewitness testimony that R.C. was driving when the two of them left the party, would have provided ample proof that R.C. was driving at the time of the crash to create reasonable doubt.  *Id.*  The state opposed admitting the data, arguing that it could be used improperly to show that R.C. had a propensity for driving above the speed limit.  *Id.* at ¶ 20.  The trial court agreed with the state and admitted only GPS data after the Shullsburg stop and the crash.  *Id.* at ¶ 21.

---

[2] It is unclear if Monahan challenges the exclusion of all of the pre-Shullsburg GPS data or just the data between the farm and Shullsburg.  The court assumes that he only challenges the most relevant GPS data -- the data from the trip between the farm and Shullsburg.

At trial, partygoers testified that Monahan was in the passenger seat of R.C.'s car when they left the farm. *Id.* at ¶ 5. First responders, police officers and medical personnel testified regarding Monahan's statements about who was driving at the time of the accident. Monahan was lying unresponsive in a cornfield when first responders arrived at the accident scene. (Ex. 16 (dkt. #5-16) 33.) When he regained consciousness, and after first responders asked who was driving several times, Monahan stated, "I was driving, I guess." (Ex. 14 (dkt. #5-14) 12.) While Monahan was lying on a backboard, a sheriff's deputy overheard him say, "that is the last time I will drink and drive." *Monahan*, 2018 WI 80, ¶ 7 n.6. When the deputy questioned Monahan directly, he claimed not to remember who was driving, but after the deputy told him that there was also a woman in the car, Monahan volunteered that he was "probably" driving. *Id.* Monahan later told the Shullsburg police chief that he did not know who was driving the car. (Ex. 13 (dkt. # 5-13) 27.)

When another sheriff's deputy asked Monahan who was driving, he responded, "I don't know, I might have been." *Monahan*, 2018 WI 80, ¶ 7 n.6. A short time later, the deputy asked again if he had been the driver, and Monahan said, "yeah, I guess." *Id.* The deputy then informed Monahan that a firefighter had reported seeing him driving the car, and Monahan stated that he was the driver.[3] *Id.* Monahan told the deputy that the crash happened because "[his] tires went off the side of the road and . . . [he] lost control." (Ex. 13 (dkt. #5-13) 93.)

---

[3] The firefighter who allegedly saw Monahan driving was never found. (Ex. 13 (dkt. #5-13) 99.)

On his way to the hospital, first responders described Monahan as "conscious, alert and oriented," smelling of alcohol, and telling them that he remembered the accident, was the driver and had been wearing a seatbelt.  (Ex. 15 (dkt. #5-15) 11, 27-28.)  About four and a half hours after the accident, Monahan, who was described as "neurologically . . . intact" at the time, but intubated following emergency surgery, asked for pen and paper, and wrote again that he remembered the accident, had been driving, was going too fast over a hill and lost control of the car. *Monahan*, 2018 WI 80, ¶¶ 7, 58; (ex. 16 (dkt. #5-16) 9, 16.)

About ten days after the crash, however, Monahan told a state trooper that he had no idea who had been driving at the time of the crash.  (Ex. 14 (dkt. #5-14) 45, 48.)  Months later, he told the same state trooper that, "it doesn't matter, you know, I wasn't driving." *Monahan*, 2018 WI 80, ¶ 7 (alteration adopted).  And nearly one year after the accident, he told another state trooper, "it's not like I meant it to F'ing happen." *Id.* (alterations adopted).

At trial, Monahan testified that, after leaving the party, the next moment he remembered was waking up in the hospital, having no memory of the accident nor of admitting that he was the driver. *Id.*; (ex. 17 (dkt. #5-17) 42.)  Monahan also testified that he had never driven R.C.'s vehicle, and he had never seen her allow anyone else to drive it.  (Ex. 17 (dkt. #5-17) 48.)

Monahan and the state presented expert testimony at trial.  The experts agreed that: (1) the car was traveling between 87 and 100 miles per hour when the crash began at the top of a hill; (2) the car's wheels left the pavement and the car "furrowed," meaning that

it moved sideways through the grassy shoulder area, such that the passenger side was the leading edge of the vehicle; (3) the car hit something, went airborne and rolled multiple times with the passenger side leading the rolls; (4) the passenger-side window and sunroof were open, while the driver-side window was closed; (5) neither Monahan nor R.C. wore seatbelts; and (6) R.C. was ejected before Monahan. *Monahan*, 2018 WI 80, ¶¶ 9-10; (ex. 15 (dkt. #5-15) 67); (ex. 16 (dkt. #5-16) 112, 134.)

The experts disagreed, however, as to who drove the car. The state's expert, Thomas Parrott, testified that Monahan was the driver because R.C.'s clothes were covered in dirt and Monahan's were relatively clean, indicating that she was in the passenger seat when the car furrowed and kicked up lots of dirt through the passenger-side window. *Monahan*, 2018 WI 80, ¶ 11. He also determined that an area where dirt had been rubbed off by the passenger-side windowsill, and the amount of dirt on R.C.'s clothes, was consistent with R.C.'s body rubbing the dirt off the passenger-side windowsill as she was ejected from the car. *Id.* Parrott further testified that R.C. had been ejected through the open passenger-side window, which made it likely that she had been seated in the passenger seat. *Id.* at ¶ 12. Finally, Parrott concluded the seat positions of the driver and passenger seats indicated Monahan was driving. Specifically, Monahan was about six feet tall and R.C. was about five feet eight inches tall, and the driver seat was positioned further back than the passenger seat. *Id.*; (ex. 13 (dkt. #5-13) 143); (ex. 15 (dkt. #5-15) 129-30.)

Meanwhile, Monahan's expert, Paul Erdtmann, testified that he could not determine who had been driving at the time of the accident, as Monahan and R.C. were "equal in terms of their possibilities." *Monahan*, 2018 WI 80, ¶ 14; (ex. 16 (dkt. #5-16)

95).   For example, pointing to dirt found inside of R.C.'s jacket and shirt, Erdtmann concluded that the dirt on her clothes was more consistent with her accumulating dirt while tumbling after being ejected from the car, rather than sitting in the passenger seat, because the dirt would not have gotten underneath her jacket and onto her shirt if she had accumulated it while sitting in the front passenger seat.   (Ex. 16 (dkt. #5-16) 98-99.) Erdtmann also noted that while R.C. was ejected before Monahan, it was equally likely that she was ejected from the driver seat through the sunroof as it was that she was ejected through the passenger-side window.  *Monahan*, 2018 WI 80, ¶ 14.  Based on testing of an example car with seat positions identical to those found after the crash, Erdtmann further determined that R.C. could have operated the car from the driver seat with no "physical constraints," while Monahan could have sat comfortably in the passenger seat.   *Id.* at ¶ 15.

In addition, Monahan's DNA and an unidentified DNA profile were on the airbag.[4] *Monahan*, 2018 WI 80, ¶ 13; (ex. 14 (dkt. #5-14) 150-155.)  Erdtmann inferred that this second DNA profile found on the driver-side airbag was R.C.'s, making the DNA evidence inconclusive as to seat position, particularly since the car had rolled and Monahan's DNA could have fallen on the driver-side airbag from the passenger seat.  *Monahan*, 2018 WI 80, ¶ 16.  Finally, R.C.'s mother testified that R.C. would place her seat as close as possible to the steering wheel, while the driver seat in the test car used by Erdtmann was set much further back than R.C. would have placed it.  *Id.* at ¶ 15.

---

[4] The Wisconsin Supreme Court's opinion also states that the driver-side airbag was "covered in blood," but as Monahan points out, there is no support for that statement in the record.  *See Monahan*, 2018 WI 80, ¶ 13.

During closing arguments, the state argued that "common sense" showed Monahan drove, as it did not make sense that "a young girl who doesn't know the area is driving on some rural road and driving, no less, after she'd been drinking and at speeds of 40 to 50 miles per hour over the speed limit[.]" (Ex. 18 (dkt. 5-18) 32.)  Later, the state made a similar argument: "Despite the fact that she's not familiar with that road, we have to believe that she's traveling -- after having some drinks, traveling 40 to 50 miles per hour over the speed limit on a road she has no experience or familiarity with." (*Id.* at 44-45).  Monahan did not object to either argument.

The jury went on to convict Monahan on three counts, two of which the trial court later dismissed under Wisconsin law, leaving Monahan convicted of one count of homicide by intoxicated use of a motor vehicle. *Monahan*, 2018 WI 80, ¶¶ 3, 23, 23 n.9.  The trial court sentenced him to 10 years' imprisonment for that count, to be followed by 10 years' extended supervision. (Ex. 1 (dkt. #5-1) 2.)  He is currently on community supervision.

## C. Appellate Proceedings

On appeal, the state conceded error by the trial court in excluding the GPS data, but the Wisconsin Court of Appeals concluded that this error was harmless because the state's case was so strong. *Monahan*, 2018 WI 80, ¶ 24.  The Wisconsin Supreme Court granted Monahan's petition for certiorari, and in a four to three decision, affirmed the state appellate court's decision, holding that the trial court's erroneous exclusion of the GPS data was harmless. *Id.* at ¶¶ 29, 67.  Applying the *Chapman v. California*, 386 U.S. 18 (1967) standard, the Wisconsin Supreme Court considered seven factors, determining that five weighed in favor of harmless error. *Id.* at ¶¶ 33-35.  Those factors were:  (1) the

frequency of the error; (2) the importance of the erroneously excluded evidence to the prosecution's or defense's case; (3) the presence or absence of evidence corroborating or contradicting the erroneously excluded evidence; (4) whether erroneously excluded evidence merely duplicates untainted evidence; (5) the nature of the defense; (6) the nature of the state's case; and (7) the overall strength of the state's case. *Id*. ¶ 35.

The court determined that the evidence "cut[ ] decisively" in favor of harmless error, as "[the state's] case would have remained strong even if the GPS data had been admitted." *Id.* at ¶ 58. In particular, the court concluded even if the jury had discounted all of Monahan's many admissions that he was the one driving the car at the time of the accident, the state's expert, Parrott, provided compelling evidence that Monahan had been the driver. *Id.* at ¶¶ 58-59. The court further noted that even defendant's own expert Erdtmann had concluded that Monahan *could* have been the driver and only disagreed that was the only reasonable conclusion from the evidence. *Id.* at ¶ 59. Finally, the court determined that the physical evidence -- the driver seat position, location of the bodies, closed driver-side window, open passenger-side window, dirt patterns on R.C.'s clothing and relative lack of dirt on Monahan's clothing -- indicated that R.C. had been in the passenger seat. *Id.* at ¶ 60.

Even so, the Wisconsin Supreme Court acknowledged two *Chapman* factors weighed in Monahan's favor. First, the GPS data was not duplicative of other evidence about the car's speed or who was driving between the farm and Shullsburg. *Id.* ¶ 48. Second, the GPS data would have supported Monahan's defense that R.C. was driving at the time of the crash, as it raised the inference that the same person was driving before and after the

8

stop. *Id.* at ¶ 50.  Nonetheless, the Wisconsin Supreme Court found additional *Chapman* factors favored the state.  For example, the court determined that the error had limited impact, as Monahan could only have used the data to rebut the state's argument that R.C. would not have driven that fast on unfamiliar roads.  *Id.* at ¶ 37.  Thus, even though the GPS data may have provided some support for Monahan's defense that R.C. was driving the car at the time of the crash, the court found this data of limited importance.  *Id.* at ¶¶ 39-40, 43-44.  Next, the court determined that the excluded GPS data was neither corroborated nor contradicted because there was no other evidence to establish the car's speed between the farm and Shullsburg.  *Id.* at ¶ 46.  Finally, the court determined that the GPS data was irrelevant to the state's case because its theory of the case was compatible with either Monahan or R.C. driving between the farm and Shullsburg.  *Id.* at ¶ 53. Accordingly, the Wisconsin Supreme Court concluded that the jury had reached the "only reasonable conclusion": (1) Monahan was driving at the time of the crash; and (2) the state's case was "very strong—and would have remained so even if the excluded GPS data had been admitted into evidence." *Id.* at ¶ 61.[5]

OPINION

Assuming that the trial court's exclusion of the pre-Shullsburg GPS data *was* a constitutional error, petitioner cannot obtain habeas relief unless he can show that the Wisconsin Supreme Court's finding of harmless error:  (1) resulted in a decision that was

---

[5] Three justices dissented, asserting that the exclusion of the GPS data was harmful because it would have supported Monahan's defense, and in particular, allowed him to refute part of the state's closing argument. *Id.* at ¶ 68.

contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  28 U.S.C. § 2254(d); *Brown v. Davenport*, 142 S. Ct. 1510, 1520 (2022) (state court's harmless-error determination qualifies as an adjudication on the merits subject to review under AEDPA).

When assessing the harmlessness of a constitutional error on habeas review, a federal court may grant relief only when it concludes that a constitutional error had a "'substantial and injurious effect or influence in determining the jury's verdict.'"  *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)); *see also Fry v. Pliler*, 551 U.S. 112, 120 (2007); *Jones v. Basinger*, 635 F.3d 1030, 1052 (7th Cir. 2011).  This standard requires *petitioner* to establish that a trial error of constitutional magnitude resulted in "actual prejudice," making it substantially less onerous for the state than the standard that applies on direct review in state court, which requires the state to prove that a federal constitutional error was "harmless beyond a reasonable doubt."  *Brecht*, 507 U.S. at 630-38 (quoting *Chapman*, 386 U.S. at 24); *see also Davis v. Ayala*, 576 U.S. 257, 268 (2015) (determining that under *Brecht*, "[t]here must be more than a 'reasonable possibility' that the error was harmful.")  Nevertheless, this federal court is to apply *Brecht* independently, "regardless of whether the state appellate court determined that the error was harmless beyond a reasonable doubt under *Chapman*[.]"  *Jones*, 635 F.3d at 1052.  As the Supreme Court explained in *Davis*, "the *Brecht* standard 'subsumes' the requirements that § 2254(d) imposes when a federal habeas petitioner

contests a state court's determination that a constitutional error was harmless under *Chapman*." 576 U.S. at 257-58 (citing *Fry*, 551 U.S. at 120)).

*Brecht*'s harmless error standard is satisfied when a reviewing judge "is in grave doubt about whether" the error is harmless, that is, when "the matter is so evenly balanced that [a judge] feels himself in virtual equipoise as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995). In that circumstance, the court must "treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *Id.* Thus, like *Chapman*, whether an error is harmless in review of a particular state conviction depends upon a host of factors, including: the importance of the witness's testimony in the prosecution's case; whether the testimony was cumulative; the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; the extent of cross-examination otherwise permitted; and of course, the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *see also Baer v. Richardson*, No. 20-CV-540-JDP, 2022 WL 2802386, at *6 (W.D. Wis. July 18, 2022) (citing the *Van Arsdall* factors in determining that, among other things, exclusion of certain evidence was harmless).

Even though *Jensen v. Clements,* 800 F.3d 892 (7th Cir. 2015), involved the improper *admission* of evidence, and this case involves the improper *exclusion* of evidence, *Jensen* is instructive in finding prejudicial error. Specifically, *Jensen* involved a letter written by the defendant's wife, Julie, two weeks before her death from ethylene glycol poisoning, stating that she would never commit suicide *and* accusing her husband of killing her, if anything

were to happen to her.  *Id.* at 895.  The state maintained at trial that Jensen killed his wife and framed it to look like suicide.  Jensen's defense was that his wife, depressed and unhappy in marriage, committed suicide and made it look like her husband had killed her.  Naturally, a key piece of evidence at trial was Julie's handwritten letter, the admissibility of which the state asserted was "'a make or break issue,'" since it was of "'extraordinary value' to 'the central issue in [the] case.'"  *Id.* at 894-95.

Before the Seventh Circuit Court of Appeals, the parties agreed admission of the letter violated the defendant's confrontation rights under the Sixth Amendment.  *Id.* at 899.  Thus, the main issue was whether admission of the letter was prejudicial.  In holding that it was, the Seventh Circuit noted that Julie's "letter from the grave" had played a key role in the case as "a unique piece of evidence," noting that "no other piece of evidence had the emotional and dramatic impact as did this 'letter from the grave.'"  *Id.* at 905.  At trial, 12 witnesses (including 5 experts) had testified about the latter; the prosecution had not only repeatedly referenced the letter in its closing argument, but ended its closing with the letter; and the evidence of guilt was "all circumstantial and subject to more than one interpretation."  *Id.* at 905-06.  Accordingly, the Seventh Circuit concluded that the admission of the letter had a "substantial and injurious effect" on the verdict.  *Id.* at 908.

In this case, whether the exclusion of the GPS data was harmless is a closer question, because the excluded GPS data is far less weighty evidence than a "letter from the grave" as in *Jensen*, and the state's case here was otherwise relatively strong.  *See Van Arsdall*, 475 U.S. at 684.  At most, the excluded GPS data here was comparatively peripheral to the *Jensen* letter because it was of a different nature and centrality to the case.  Still, this GPS

data arguably supported petitioner's defense that R.C. was driving at the time of the crash, and thus, it went to the central, disputed factual issue in the case. Specifically, crediting eyewitnesses' and petitioner's testimony that R.C. was driving when they left the farm, the excluded GPS data showed that R.C. drove at high speeds between the farm and Shullsburg. The admitted GPS data also showed that the car traveled at similar speeds between Shullsburg and the crash site. Thus, taken together, the GPS data supports an inference that R.C. drove the whole time.

However, unlike the *Jensen* letter, the excluded GPS data was neither unique nor more impactful than the other circumstantial evidence in petitioner's case. Aside from petitioner's confessions, much of the physical evidence -- the dirt on R.C.'s clothes, physics of the crash, car seat position and DNA evidence -- was itself circumstantial and open to interpretation, as shown by the experts' differing opinions. The excluded GPS data would likewise have been open to interpretation.

Again, unlike the *Jensen* letter that plainly implicated the defendant as the killer, the GPS data here neither plainly implicates R.C. as the driver at the time of the crash nor exonerates petitioner. Indeed, the excluded data contained *no* identifying information about the driver and only showed that the car traveled fast. Further, even if R.C. drove fast on the first leg of the journey, the GPS data merely suggests the possibility that she drove similarly on the second leg. Said another way, R.C. was not uniquely capable of driving fast; R.C. and petitioner could have changed drivers during the two-minute Shullsburg stop, and petitioner could have driven just as fast on the second leg of the trip.

13

In fairness, the state twice improperly argued in closing arguments that R.C. would not have driven fast on unfamiliar roads, an argument that petitioner could have rebutted had the trial court admitted the farm-to-Shullsburg GPS data.  However, petitioner did not object to either statement at trial, nor does he raise an ineffective assistance of counsel claim as to his trial counsel's failure to object now.  In any event, unlike in *Jensen* (where the letter featured prominently in the state's closing argument, including in its final appeal to the jury), the two improper asides about R.C.'s ability to drive so fast make up a small part of the state's 34-page-long closing argument.

Moreover, the state's case was otherwise relatively strong.  First, petitioner admitted, or implied, that he was the driver on at least eight occasions.  Certainly, there are reasons to discount *some* of his equivocal admissions: "I was driving, I guess"; a statement made shortly after he had been lying comatose in a corn field, while presumably still drunk; and a statement made after police officers pressed him while he was on a backboard.  However, petitioner's post-surgery admission that he drove the car too fast over a hill, lost control and crashed was clear and voluntary, while he was considered neurologically intact.  Further, this statement was accurate as to how the crash actually unfolded.  Moreover, although petitioner did not admit to being the driver all the time, 8 out of the 14 times that he talked about the car accident, petitioner stated or implied that he was the driver.

Second, the accident reconstruction experts drew different conclusions about the meaning of *some* of the physical evidence, petitioner's own expert, Erdtmann, could not rule him out as the driver, stating only that the evidence was inconclusive.  And even

14

though Erdtmann testified that R.C. could also have been operating the car without "physical constraints" from the driver seat, the fact that the driver seat was positioned further back than the passenger seat is additional evidence that petitioner, who was taller than R.C., was driving the car at the time of the crash, especially given testimony that R.C. liked the seat to be as close to the steering wheel as possible.

Therefore, even though the trial court's exclusion of the GPS data was probably error, this court is unable to find that its exclusion had a substantial and injurious effect or influence on the jury's verdict under the narrow review standard by a federal court allowed after *Brecht*. It follows that petitioner cannot establish that the Wisconsin Supreme Court unreasonably applied *Chapman* in finding this error harmless, and he is not entitled to federal habeas relief.[6]

The only remaining question is whether to grant petitioner a certificate of appealability. Under Rule 11 of the Rules Governing Section 2254 Cases, the court must issue or deny a certificate of appealability when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). This means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed

---

[6] As a result, the court need not address petitioner's argument that the Wisconsin Supreme Court erroneously applied a sufficiency-of-the-evidence test in affirming the conviction, rather than a harmless error test. *See Richardson v. Griffin*, 866 F.3d 836, 844-45 (7th Cir. 2017) (petitioner who showed that state court erred by unreasonably applying *Chapman*'s standard still had to show actual prejudice under *Brecht* to obtain habeas relief).

further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation marks and citations omitted).   Petitioner is entitled to a certificate of appealability as to whether the trial court's erroneous exclusion of the GPS data was harmless because the question is close enough that reasonable jurists might resolve it differently.

ORDER

IT IS ORDERED that:

1)  Petitioner Kyle Lee Monahan's petition under 28 U.S.C. § 2254 (dkt. #1) is DENIED, and this case is DISMISSED.

2)  Petitioner is GRANTED a certificate of appealability.

3)  The clerk of court is directed to enter judgment for respondent and to close this case.

Entered this 2nd day of January, 2024.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

16